## ALLISON, (WHITFIELD v.)

[See Whitfield v. Allison, Case No. 17,571.]

## ALLWINE, (CAMAC v.)

[See Camac v. Allwine, Case No. 2,328.]

## ALLYN, (GOODYEAR v.)

[See Goodyear v. Allyn, Case No. 5,555.]

## ALLYN, (SMITH v.)

[See Smith v. Allyn, Case No. 13,000; Id. 13,001.]

## Case No. 253.

### The ALMA.

[2 Spr. 203;¹ 25 Law Rep. 663.]

District Court, D. Massachusetts. June 20, 1863.

PRIZE—RELOCATION OF BLOCKADE—HOSTILE VESSELS.

1. The president's proclamation of 14 May, 1862, "relaxing the blockade" of Beaufort, N. C., and opening it to trade under regulations of the treasury department, the port being in our military possession, must be construed, so far as neutrals are concerned, as having entirely raised the blockade; and neutral vessels bound there, in violation of the regulations of the treasury department, are not guilty of an attempt to break the blockade.

2. Vessel and cargo condemned for breach of blockade, the evidence showing an actual hostile destination.

In admiralty.

R. H. Dana, Jr., U. S. Atty., for the United States and captors.

SPRAGUE, District Judge.—This vessel was captured on the 2d May last, by the United States brig Perry, off the coast of North Carolina, within four or five miles of the beach, and near New Topsail Inlet. The master, mate, and all the crew were brought here in the prize, and their evidence has been taken. No claim has been put in for either vessel or cargo, although the master and mate both testify that they owned portions of the cargo, and that the vessel and rest of the cargo belonged to one James B. Heyl, a merchant in Bermuda, who appointed and employed the master. There were found on board the vessel a certificate of registry in the name of J. B. Heyl, shipping articles which described the voyage as from Bermuda to Beaufort, N. C. (a port now in our military possession), and back, a certificate of clearance for the same voyage, a manifest representing the same voyage, and a letter from Mr. Heyl to one W. I. Potter, at

¹[Reported by Hon. Richard H. Dana; published under the supervision of John Lathrop, Esq.; and here reprinted by permission.]

Beaufort. The log-book seems to have correctly described the vessel's course, though imperfectly, to the day of the capture.

It appears, from the evidence of the master and crew of the Alma, that she first sailed from Bermuda on the 6th March last, and put back from heavy weather, leaking, repaired damages, made some changes in her cargo, and sailed again on the 22d April. Her capture was eleven days afterwards. It appears, from the same evidence, that the schooner made the land the afternoon before her capture, stood off again to sea, and stood in again the next morning. Her position was then about thirty-five miles to the southward of Beaufort, and about twenty miles to the northward of New Topsail Inlet. The wind was in a northeasterly direction, being ahead for Beaufort. She stood in on the starboard tack, until she was very close to the beach, and then kept off and stood down the coast in a southerly direction, and then hauled up, on the port tack, and stood out to sea. One witness says that their reason for wearing round, instead of tacking, was because the vessel worked badly. No other witness says this, and no attempt seems to have been made to put her in stays. The reason they give for keeping off and running free, when Beaufort was to windward, is, that they saw the United States brig-of-war Perry, and wished to speak her. One witness however, says that the schooner did not keep off for the Perry, but stood out to sea, close hauled on the port tack. No reason is given why they should wish to speak the Perry. It is not clear how long they ran down the coast, but only that they did so. The reason assigned is, that the master did not know precisely where he was. It seems, however, that he got an observation that day at noon. It is a circumstance of suspicion that the register of the vessel, in the name of this owner, bears date the very day that the vessel sailed from Bermuda, when all her cargo was on board, and that the letter to Mr. Potter is of the same day. No bills of lading or invoice, and no documentary evidence whatever of title to the cargo, were found on board, and the master admits there were none. The letter to Mr. Potter is written as to an entire stranger, and would be as useful to one stranger as to another. Mr. Heyl says, "I send you a cargo at random," and gives Mr. Potter free leave to sell as he pleases, and send a return cargo of pitch-pine lumber. It gives no measures or quantities of the cargo, nor could the consignee ascertain these by any papers on board, except by such a manifest as the master might choose to make. The clearance describes the cargo as solely spirituous liquors, and there is no invoice and no bills of lading to ascertain the truth. The outward cargo was salt and rum, not a cargo likely to be sent from Bermuda to Beaufort, a port in our military possession,

where the landing of rum is under strict police control, and where salt is nearly as cheap as in New York, while both these articles would bring extraordinary prices at any port under rebel control. In the captain's venture was some naval clothing, not a profitable investment for Beaufort. Nor is it likely that Beaufort, at this time, would furnish a profitable return cargo of pine lumber. The mate of this vessel is a citizen of North Carolina, well acquainted with that coast, having been long engaged in its coasting-trade, and fitted to act as pilot there, and had been in the rebel army (as appears by evidence to be hereafter alluded to). It is not probable, therefore, that he would desire to go to Beaufort, placing himself within reach of our troops. This is the state of the preparatory proofs. They raise great doubts of this being a bona fide voyage in British ownership, to Beaufort, with a cargo actually consigned and destined to that port; and the conduct of the vessel, on the morning of her capture, is hardly consistent with the notion that she was beating up to Beaufort, but is much more consistent with her having made out her position, and run down for the inlet, until she found herself cut off by the Perry, and then attempting to escape her by standing out to sea.

In this state of evidence, I have admitted further proofs by the captors. This consists of the depositions of the prize master, an acting ensign in the Perry, and two petty officers of the Perry, who came here in the prize. They testify that the Perry saw this schooner in the morning, and that she ran in very close to the shore, at a point about thirty-five miles south of Beaufort, and then kept off, in the direction for New Topsail Inlet; that the Perry stood so as to cut her off, and, when it became evident that she was cut off, she came close on the wind, and stood out to sea, but was outsailed by the Perry, and brought under her guns. The two petty officers testify that the mate and crew of the Alma, on the passage home, freely admitted that they were running for the inlet; and the mate said he got too far to the northward, and tried to run down and get in before the Perry cut her off. It is also testified that the Alma worked well, and was in good trim. I have so far treated the case as if a destination to Beaufort, N. C., was an innocent destination at this time. That port was placed under blockade by the proclamation of April 27, 1861, and was under actual blockade until it was taken by our troops. On 12th May, 1862, the President issued a proclamation declaring that, as to the ports of Beaufort, N.

C., Port Royal, S. C., and New Orleans, "the blockade may now be safely relaxed," and declaring the blockade so far to cease as to allow commercial intercourse with those ports, "subject to the laws of the United States, and to the limitations and in pursuance of the regulations which are prescribed by the Secretary of the Treasury in his order of this date." This order gives notice that to vessels clearing from foreign ports to the "ports opened by the proclamation," licenses will be granted by the United States consuls, upon evidence that the vessels will deal in no contraband persons or property, which licenses shall be exhibited to the collectors of the ports, and to the blockading vessels, if required. It then declares that "in all other respects the existing blockade remains in full force and effect as hitherto established and maintained, nor is it relaxed by the proclamation, except in regard to the ports to which the relaxation is, by that instrument, expressly applied." [12 Stat. 1263.]

It is suggested by the United States Attorney, that the proclamation merely relaxes the blockade of these ports so far as to let in vessels so licensed. But although the language is not clear, I think that, on general principles of the laws of war affecting neutrals, I must hold that the proclamation entirely raises the blockade of these ports as to neutrals. The proviso respecting the license is a regulation of trade with a place in our military possession; and whatever might be the effect, in another proceeding, in case a vessel should enter one of these posts without a license, or should violate the license, it would not make her a prize of war for breach of blockade. Otherwise, I should be obliged to hold that the obstacle of a blockade, as to each neutral vessel, depended upon the decision which the several consuls of the United States, at the several neutral ports over the globe, might make in the case of every vessel applying for a license, while our own vessels, sailing coastwise, are to apply for licenses to the Department of the Treasury. But while the absence of any license to this vessel from the American consul at Bermuda does not make Beaufort a prohibited port to her, it is corroborative evidence that she was not bound there. This proclamation and order must have been known in Bermuda for nearly ten months before this vessel sailed; and it can hardly be supposed that a British merchant, sole owner of vessel and cargo, would have sent her to Beaufort without a license. The vessel and cargo are to be condemned for an attempted breach of blockade.